[No. 31279. *En Banc.* June 7, 1950.]

THE STATE OF WASHINGTON *et al., Appellants,* v. A. E. BOREN *et al., Respondents.*[1]

*Charles O. Carroll, John S. Vogel, Riddell, Riddell & Hemphill,* and *John H. Madden, Jr.,* for appellants.

*Jeffrey Heiman,* for respondents.

SCHWELLENBACH, J.—The state of Washington, and Foote and Zech, as interveners, commenced an action in the superior court for King county, alleging that defendants Boren and Shepherd had never been licensed to practice dentistry in the state of Washington, but that they had been and were then practicing dentistry in Seattle; that defendant Harlow was aiding and abetting them in the practice of dentistry at 1909 Westlake avenue, in Seattle; that defendant Stickels was aiding and abetting them in the practice of dentistry at 1410 Second avenue, Seattle. Plaintiff prayed that the defendants be enjoined from such illegal practices.

[1]Reported in 219 P. (2d) 566.

Defendants answered, denying all the allegations of the complaint, except the allegation that Boren and Shepherd were not licensed to practice dentistry in the state. As an affirmative defense, defendants alleged:

"That Rem. Rev. Stat. Sec. 10030 as amended by the Laws of 1937, Chapter 45, particularly Sec. 10031-6, is in violation of Article XIV, Sec. 1 of the Constitution of the United States, and in violation of Article I, Sec. 3, Article I, Sec. 12, and Article I, Sec. 23 of the Constitution of the State of Washington."

At the close of the plaintiff's case, the court granted a motion of dismissal as to the defendant Stickels, on the ground that the testimony introduced by the plaintiff and interveners was not sufficient to establish a cause of action against such defendant. We are unable to say that the evidence preponderates against the finding and conclusion of the trial court in that regard, and will not burden this opinion with any discussion of the evidence concerning Stickels.

A. E. Boren and W. W. Shepherd never have been licensed to practice dentistry in the state. Dr. C. D. Harlow has been, and at the times involved in this transaction was, licensed to practice dentistry in the state.

For some time prior to the events leading up to the transaction under consideration, Boren and Shepherd had been associated together as copartners (known as Dental Management Company) in the ownership, maintenance, and operation of offices in the state for the practice of dentistry. They operated in Bremerton, Bellingham, Vancouver, and Seattle.

One of such offices was at 1909-1913 Westlake avenue, in Seattle. The equipment and furnishings therein cost them $13,782.45. In 1946 this business was transferred to one Dr. Bergman, a licensed dentist, by bill of sale in the amount of $45,000, secured by a mortgage. Dr. Bergman died in 1947. The business was thereupon turned back to the partnership, which then entered into a conditional sales contract with defendant, Dr. Harlow, for a consideration of $55,000. Dr. Harlow agreed to pay $750 a month on the contract.

As a part of this deal, Boren was employed as manager at $500 a month. Dr. Harlow testified concerning Boren's status:

"He manages the office end of it, buying the supplies and watching the charts and making out the accounts and payments, and general manager, and looking after the advertising."

Under this arrangement Dr. Harlow also drew a salary of $500. So we find that in addition to the ordinary costs of operation, there was each month paid out of the business, the following: To Dental Management Company, on the contract, $750; to Dr. Harlow, salary, $500; to Mr. Boren, salary, $500.

But this was not all. From March, 1947, to January, 1948, there was paid to Boren, in sums ranging from $500 to $1,500, as a "bonus," a total of $7,500. In 1948, up to the time of the commencement of this action, the following "bonus" payments were made to Boren: January, $1,000; February, $1,500; March, $750; April, $742.86; May, $616.51; May, $841.42; July, $1,265.16; August, $765.16. Dr. Harlow testified that the "bonus" payments were given in appreciation of the increase in business. No explanation was given as to why this money was not paid to the partnership in reduction of the contract obligation.

From all of the foregoing, the trial court found, as do we, that the defendants Boren and Shepherd, with the knowledge and consent of defendant Harlow, own, manage, and operate the dental office at 1909-1913 Westlake avenue, Seattle.

However, the court concluded that Rem. Rev. Stat. (Sup.), § 10031-6 [P.P.C. § 501-11], in so far as it prohibits one who has not a license to practice dentistry from owning, maintaining or operating an office for the practice of dentistry, is in violation of the constitution of the state of Washington under the decision of *State v. Brown*, 37 Wash. 97, 79 Pac. 635, 107 Am. St. 798, 68 L. R. A. 889. The trial judge stated that, in his opinion, the decision in the *Brown* case was wrong, but that it was not within his province to over-

rule the supreme court. He accordingly dismissed the case as to the defendants Boren, Shepherd, and Harlow.

The people of this area, for their mutual benefit and protection, established the state of Washington. They are the state. Its acts are their acts. The state, under its police power, has the right, and it is its duty, to protect its people in their health and general welfare. The very existence of government, as well as the security of the social order, depends upon this right. This is especially true as to the health of the people, which affects every man, woman, and child within the state.

When a person engages the services of a doctor, a dentist, or an optometrist, he is entering a realm of which he knows practically nothing. Of necessity, he must rely upon the skill and training of the expert to whom he goes. So the state, for the protection of its citizens, through the exercise of its police power, has attempted to regulate the conduct of such learned professions by requiring that each person practicing such a profession must first obtain a license to so practice. As a further precaution, the state has designated certain subjects, peculiar to the particular profession, in which the applicant must prepare himself before he can be examined as to his fitness to practice his profession.

The state of Washington, for a great many years, has required a license from the state board of dental examiners before one may "treat diseases or lesions of the human teeth or of jaws or correct malpositions thereof." *State ex rel. Smith v. Board of Dental Examiners,* 31 Wash. 492, 72 Pac. 110. The defendant in the *Brown* case attacked the constitutionality of that portion of the then existing "dental law" which provided:

"All persons shall be said to be practicing dentistry within the meaning of this act . . . who shall own, run, or manage a dental office . . ."

Subdivision 6 of Rem. Rev. Stat. (Sup.), § 10031 (the section declared unconstitutional by the trial court in the instant case), defines the practice of dentistry as follows:

"A person practices dentistry, within the meaning of this act, . . . who owns, maintains or operates an office for the practice of dentistry; . . ."

It will thus be seen that the provisions of the two acts are practically identical.

In holding that portion of the "dental law" unconstitutional in the *Brown* case, this court said:

"It is solicitude for the physical well-being of the public, or that portion that may need dentistry work, which justifies that part of the statute providing for the examination and licensing of those who desire to 'treat diseases or lesions of the human teeth or of jaws or correct malpositions thereof.' To perform such work with safety and proper regard for health and comfort, the operator must possess technical knowledge and skill peculiar to the study and practice of dentistry. Can the same be said of one desiring to 'own, run, or manage' a dental office? We think not.

"To own and manage property is a natural right, and one which may be restricted only for reasons of public policy, clearly discernible. To hold this portion of the statute valid would be to make possible conditions which were never designed to exist. To illustrate, suppose a man thoroughly qualified and legally licensed as a dentist should die, leaving a perfectly and completely equipped dental office to his widow, who knew nothing of dentistry and was incapable of securing a license. By continuing to 'own' this property any appreciable time she would become liable to prosecution, under this part of the statute. Can the police or any other power be constitutionally invoked to produce such a result? We are led to believe not. Let us carry the illustration a little further. The widow, not being able to sell the dental office to advantage, decides to hire competent and legally licensed dentists to treat patrons of the office, and undertakes the management herself, paying bills, collecting accounts, arranging credits, making appointments, and doing other acts necessary to the supervision and control of the business affairs of the concern. Then she becomes a criminal, if this portion of the statute have virtue, because she has 'managed a dental office.' And yet, it will scarcely be contended that any of these acts injuriously affect 'the health, good order, morals, peace, or safety' of society, or menace 'the lives, limbs, health, comfort, quiet or property' of the patients treated in such office. Many similar illustrations will readily occur to the mind given to

the contemplation of the natural results reasonably to be anticipated under the operation of such a statute.

"A consideration of the province of the police power, in the light of constitutional rights, would seem to show, beyond controversy, that in the enactment of this portion of the statute the legislature transcended its authority. Should the owner or manager hire operators not legally qualified, or should they participate in the treatment or operations mentioned in the other portion of the statute, they would, of course, be amenable to and punishable under those provisions. But we are unable to say or perceive that the health, moral or physical welfare of the public, or any of the personal or property rights of its individuals, are endangered by the ownership and management of a dental office, so long as those employed therein to do the actual dentistry work are qualified and licensed as by law required."

Appellants urge the re-examination of the *Brown* case and submit that it be overruled. Since that decision, this court, in several instances, has had occasion to decide questions closely allied to the problem now confronting us.

*Deaton v. Lawson,* 40 Wash. 486, 82 Pac. 879, 111 Am. St. 922, 2 L. R. A. (N.S.) 392, was an action to recover money paid on a contract for medical services between the State Medical Institute and Deaton. Lawson, who owned, operated, managed, and controlled the "State Medical Institute," employed therein Dr. Richards, a physician. In affirming a judgment for the plaintiff, this court said:

"The findings of the court and the entire testimony clearly show that this was the personal contract of O. V. Lawson. The reference in the body of the contract to the State Medical Institute, its officers, and the physician in charge, and the claim of the appellant Lawson that he signed the contract as secretary for Dr. Richards, are but so many pretenses to evade the laws of the state. . . .

"Stripped of all subterfuges and pretenses, this is neither more nor less than a contract on the part of appellant Lawson to render professional services for the respondent, a contract he could not perform without violating the laws of the state. The contract was therefore against public policy, and is utterly void."

*State ex rel. Standard Optical Co. v. Superior Court,* 17 Wn. (2d) 323, 135 P. (2d) 839, was a proceeding in the

nature of *quo warranto* against the defendant corporation, charging it with unlawfully practicing optometry. The corporation operated a store in Wenatchee, which was in sole charge of a licensed optometrist employed and paid by the corporation. The corporation exercised no control over the professional judgment of the optometrist, who made his own determinations in advising whether or not glasses were needed. In holding that the course of business followed by the corporation constituted the practice of optometry and was therefore unlawful, we quoted with approval from the South Carolina case of *Ezell v. Ritholz,* 188 S. C. 39, 198 S. E. 419, as follows:

"If such a course were sanctioned the logical result would be that corporations and business partnerships might practice law, medicine, dentistry or any other profession by the simple expedient of employing licensed agents. And if this were permitted professional standards would be practically destroyed, and professions requiring special training would be commercialized, to the public detriment. The ethics of any profession is based upon personal or individual responsibility. One who practices a profession is responsible directly to his patient or his client. Hence he cannot properly act in the practice of his vocation as an agent of a corporation or business partnership whose interests in the very nature of the case are commercial in character."

*State ex rel. Lundin v. Merchants Protective Corp.,* 105 Wash. 12, 177 Pac. 694, was a proceeding in *quo warranto* to inquire into the right of the respondent corporation to do business in the state. The corporation employed either an attorney or a firm of attorneys, and then sent solicitors out to secure memberships. The membership fee was ten dollars a year, of which the corporation took nine dollars and gave one dollar to the attorneys. Members were to be defended in all civil or criminal actions brought against them in police or justice of the peace courts, without charge. In holding that the corporation was unlawfully practicing law as a principal through its agents, we said:

"The practice of the law is not a business that is open to a commercial corporation.

" 'Since, as has been seen, the practice of law is not a lawful business except for members of the bar who have com-

plied with all the conditions required by statute and the rules of the courts, and as these conditions cannot be performed by a corporation, it follows that the practice of law is not a lawful business for a corporation to engage in. As it cannot practice law directly, it cannot do so indirectly, by employing competent lawyers to practice for it, as that would be an evasion which the law will not tolerate.' 2 R. C. L. 946.

"See, also, *In re Co-operative Law Co.,* 198 N. Y. 479, 92 N. E. 15, 139 Am. St. 839, 32 L. R. A. (N.S.) 55.

"The practice of the law is a personal right, and that the public may not be imposed upon by the unworthy, the law requires that those engaged in practice shall be men of good moral character and with certain qualifications and a degree of learning, to be ascertained by the agents, not of the courts, but of the whole people speaking through the legislative body. The right to practice law attaches to the individual and dies with him. It cannot be made a subject of business to be sheltered under the cloak of a corporation having marketable shares descendible under the laws of inheritance. One engaged in the practice of the law is subject to personal discipline for misconduct and to penalties for violating the ethics of the profession that could not possibly attach to a corporate body."

*Laughney v. Maybury,* 145 Wash. 146, 259 Pac. 17, 54 A. L. R. 393, was a proceeding by A. M. Laughney, a licensed and practicing osteopathic physician and surgeon, to enjoin the prosecuting attorney from prosecuting him for unprofessional conduct. We there said:

"As to the right of a physician or surgeon to be protected in his profession under the guarantees of both constitutions, there is, of course, no doubt. It may be stated, generally, that anyone has a right to pursue any lawful calling, yet, in respect to certain vocations not in themselves unlawful, including the practice of medicine and surgery, the right is necessarily and properly subject to legislative restrictions or regulations from consideration of public policy. They are vocations which, from time to time and in one way or another, very nearly concern the health, comfort, life and general welfare of every person, and statutes designed to accomplish such restrictions or regulations are founded upon the police power inherent in the state."

*Campbell v. State,* 12 Wn. (2d) 459, 122 P. (2d) 458, was an action by Dr. J. C. Campbell, a duly licensed dentist,

owning and operating a dental office in Seattle. He alleged that the director of licenses was threatening to prevent him from opening a dental office in Tacoma, in which he intended to participate by contract with a regularly licensed dentist; that the director of licenses claimed that in so doing the plaintiff would violate Rem. Rev. Stat. (Sup.), § 10031-18 [P.P.C. § 501-35], which made it unlawful for a person to conduct a dental office in his name, unless he was personally present operating as a dentist or personally overseeing such operations during a majority of the time. It was contended that the above statute was in violation of the constitutions of the United States and of the state of Washington. In holding the statute constitutional, we said:

"The provision of the statute here under attack must be considered with reference to the entire act of which it is a part. It may be presumed that, in the opinion of the legislature, the conduct of a dental office under the name of one who, although a licensed dentist, was not personally present in the office a majority of the time, was a pernicious practice, tending to mislead persons patronizing such office in the expectation that the services sought and paid for would be personally rendered or supervised by the dentist whose name is held out to the public as conducting the office. It cannot be held that the legislature was mistaken in acting upon the premise stated.

"The relationship between dentist and patient is inherently personal in the highest degree. Certainly it is within the province of the legislature to protect the public against all forms of fraud and deception tending to conceal the professional identity of the dentist who is, in fact, rendering the service in the particular office frequented by one in need of dental assistance. By the practice denounced by the act, the public may be unwittingly deprived of a personal relationship which may rightfully be expected, and another personality substituted therefor. The use of the name of a certain dentist as conducting an office for the practice of dentistry should mean something more than merely physical ownership of the office, or the right to use the name, which may have a value because of long continued use or commercial advertising.

"It may well be that the operation of the office in Tacoma, which appellant desires to open under his own name, would, in and of itself, result in no harm to the public. The legis-

lature, however, was entitled tò consider and deal with the general problem of the commercial exploitation of the dental profession. If, in the opinion of the legislature, chain office dentistry and dental offices conducted under corporate or fictitious names, or under the name of a dentist who has nothing to do with the practice of the profession in connection with the carrying on of the office, tend to introduce into the profession unscrupulous practices which tend to lower the ethics and standards of the dental profession, to the injury of the health of the community and the public welfare, the legislature had the power to place the limitation in question upon the general practice of the profession, even though in certain cases the act forbidden might not result in any of the evils which it was believed might follow from the frequent employment of the forbidden practice.

"Appellant suggests a number of hypothetical situations, which he contends illustrate possible results from the enforcement of the statute, which would be violative of the constitutional rights referred to. It is suggested that, under the provisions of the statute in question, the widow of a deceased dentist could not conduct her late husband's practice under his name, nor under her own name, unless she were a licensed dentist, and that a dentist engaged in the practice of his profession under his own name would violate the statute and become liable to the penalties thereof if he were absent from his office for a while because of illness or for any other reason of convenience or necessity. It is also suggested that dental products bearing the personal name of their producer could not be advertised in connection with any dental office unless the producer were personally present a majority of the time.

"It must be assumed that a law will be given a reasonable and not a strained construction. We deem it unnecessary and inappropriate, in deciding the question here presented, to consider the possible application of the statute to the hypothetical situations suggested by appellant. Questions arising concerning the application of the statute to questions such as those suggested will be reserved for future consideration, when actually presented for judicial determination."

██ The general rule throughout the country is that no unlicensed person or entity may engage in the practice of medicine, surgery, or dentistry through licensed employees. See Annotation, 103 A. L. R. 1240. We have been unable to

find a state court which has cited *State v. Brown* with approval. In fact, we have been unable to find that this court has cited it with approval. Rather, it has distinguished it in each instance. For two well considered cases from other jurisdictions on this precise subject, see *State v. Bailey Dental Co.*, 211 Iowa 781, 234 N. W. 260, and *Painless Parker v. Board of Dental Examiners*, 216 Cal. 285, 14 P. (2d) 67.

We agree with the general statement in *State v. Brown* that "to own and manage property is a natural right." But there is a clear distinction between the right of the state to interfere with the owning and managing of property, as such, and its right, under its police power, to protect the health of its people. Experience has shown that the care and treatment of the teeth requires, not only skill, but the personal relationship between dentist and patient. It requires the services of a trained expert, learned in his profession.

The care and treatment of the teeth is not a business. It is not a commercial transaction. It is a profession. A person may own and sell dental equipment and supplies. But the state, in the exercise of its police power, has said that he cannot, without a license, practice dentistry. The state has said, in its wisdom, that a person practices dentistry "who owns, maintains or operates an office for the practice of dentistry." There can be no question but that the activities of Boren and Shepherd come within this definition. The state has decided that such a practice does not adequately protect the health of its people. Clearly, such a regulation is a reasonable exercise of its police power.

For the reasons hereinabove assigned, the decision in *State v. Brown* is hereby overruled.

The judgment of dismissal as to respondent Stickles is affirmed. The judgment of dismissal as to respondents Boren, Shepherd, and Harlow is reversed, and remanded with directions to grant the prayer of appellant's complaint as to them.

SIMPSON, C. J., BEALS, ROBINSON, GRADY, HAMLEY, and DONWORTH, JJ., concur.

MALLERY, J. (dissenting)—Rem. Rev. Stat. (Sup.), § 10031-6 [P.P.C. § 501-11], which provides: "A person practices dentistry . . . *who owns, maintains or operates an office for the practice of dentistry;* . . ." (italics mine) contravenes Art. I, § 12, of the Washington constitution, which provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation, other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

I do not question the right of the legislature to require a license for the practice of dentistry, but I cannot agree that the legislature can define something as dentistry which patently is not dentistry.

Any American citizen can own any tangible thing subject to ownership. Management and control of property is a prerogative of ownership of all who are *sui juris.*

The constitutional prohibition against special privileges and immunities bars the legislature from saying who can own what. To do otherwise, as in this case, is classification of property owners according to occupation. It is as unconstitutional as a classification according to race, creed, or color. Property rights cannot be subjected to a caste system without destroying the essence of our American constitutional system of government. That it has been done by indirection, and while attention is focused elsewhere, does not change its effect.

The particular use permitted of property is, of course, another matter. Zoning and safety requirement laws have been upheld as proper exercises of the police power, but they have no reference to, or limitation upon, the ownership and the right to control as such, within the limitations of the law. The legislature can say who may practice dentistry, but it cannot say who may own, maintain, or operate, a dental office. If it could do so, it could also say who may own barber shops or any other property used by licensees.

Let it be remembered that the adequacy of the dental premises or equipment has not yet been subjected to the

police power by any licensing provisions, and is not here in question. Neither is there here involved any question of wrongful advertising by which the public is misled, either as to the dentist personnel, their competency, or the nature of the service offered. Where equipment is not licensed, the only remaining concern of the state, upon which it can exercise its police power, is the competency of the operator.

The exercise of the police power in this case purports to protect the public from incompetency in dentistry. The state cannot control the dentist-patient relationship for any other purpose.

There seems to be a tacit assumption that all dentists who manage their own offices are good, and all others are bad, and that, because dentistry is a profession, the competency of its practitioners can be insured by requirements in addition to licensing. From decision to decision, there has been copied a touching picture of the dentist-patient relationship, which, if drawn merely to justify the licensing of the practice of dentistry, would have some cogency. Just what it proves with regard to a dentist's private financial affairs and nonprofessional acts, or its bearing on the ownership and management of property, which is neither itself a profession nor a necessary incident to any profession, has never been pointed out.

There is no technique known to the courts by which the competency of a dentist can be determined, other than by his possession or lack of a license to practice dentistry. The law conclusively presumes that the possessor of such a license is competent and that all others are not.

Of course, licenses may be required for both professional and nonprofessional activities involving the health, safety, or convenience of the public. But, in all cases, the licensing procedure is conclusive upon the question of the right to do the licensed act, and no valid distinction can be shown which would destroy property rights incident to the professions and not do likewise to all licensed occupations.

Principles of law declared in cases involving constitutional questions, should have uniform application. The dodge of "each case upon its own facts" should never be

used to destroy a constitutional right. Hence, if the majority opinion is sound in overruling the *Brown* case, it follows that, if an activity can be licensed under the police power, the ownership of all property connected therewith can be limited to licensees.

While exercise of the police power is indispensable to any organized society, and its absence is anarchy, still, unrestrained police power is found only under a despotism. Our American liberties inhere in the constitutional restraints upon the police power. It may be properly used only to promote the health, safety, and convenience of *the public*. When misused as an economic device to promote special privileges for individuals in the ownership and management of property, it becomes an instrument of regimentation. Titles of nobility could be no more objectionable.

Where, as here, the legislature has, by improper definition, grafted an economic discrimination prohibited by the constitution upon a measure otherwise within its power to enact, this court should segregate and invalidate the offending part, as was done in the *Brown* case.

HILL, J., concurs with MALLERY, J.

———————

July 19, 1950. Petition for rehearing denied.